JASON D. KELLEY )
)
    Plaintiff, )
)
v. )     CAUSE NO.:  4:12-CV-064-JD
)
CAROLYN W. COLVIN, )
COMMISSIONER OF SOCIAL )
SECURITY,[1] )
)
    Defendant. )

## OPINION AND ORDER

On November 21, 2012, Plaintiff Jason D. Kelley ("Kelley"), by counsel, filed his

Complaint seeking review of the final decision of the Defendant Commissioner of Social

Security ("Commissioner") [DE 1].  The Commissioner filed an Answer to Kelley's Complaint

on February 11, 2013 [DE 11].  On May 2, 2013, Kelley filed his brief in support of his request

to reverse the decision of the Commissioner [DE 15], to which the Commissioner responded on

June 28, 2013 [DE 16].  On July 18, 2013, Kelley filed his reply [DE 19].  The matter is now ripe

for ruling and jurisdiction is established pursuant to 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

On August 25, 2010, Kelley filed a Title II application for disability insurance benefits

("DIB") and supplemental security income ("SSI") (Tr. 78–81), alleging a disability since

August 1, 2010 resulting from a learning disability, mental retardation, ADHD, and problems

---

[1]     Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), Colvin is substituted for Michael J. Astrue as the Defendant in this action.  No further action needs to be taken as a result of this substitution. 42 U.S.C. § 405(g) ("[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

with reading. (Tr. 224).[2]  Kelley's applications were initially denied on September 3, 2010, and

again upon reconsideration on October 28, 2010.  (Tr. 82–95).  Consequently, on November 2,

2010, Kelley requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 100–01).

On June 30, 2011, Kelley, represented by counsel, appeared and testified at a hearing

held before ALJ Jason Mastrangelo in Valparaiso, Indiana.  (Tr. 32–61).  Kelley's mother,

Margaret Sako, and a Vocational Expert ("VE"), Leonard Marion Fisher, Ph.D., also testified.

(Tr. 61–76).  Thereafter, the ALJ determined that Kelley was capable of performing his past

work and other work in the economy, and thus, did not qualify for benefits.  (Tr. 26).  Kelley

requested that the Appeals Council review the ALJ's decision, but his request was denied on

August 16, 2012, making the ALJ's decision the Commissioner's final decision.  (Tr. 5).

## II.  STATEMENT OF FACTS

*A.  Medical Background*

Kelley was born on May 20, 1982; therefore, he was 28 years old when he applied for

disability and 29 years old on the date the ALJ issued his decision.  (Tr. 38).  A sixth grade

educational evaluation completed in September 1994 provided that Kelley functioned

academically at a first or second grade level.  (Tr. 254).  Various tests were also performed in

September 1994, including the Wechsler Intelligence Scale for Children Test Third Edition

("WISC-III"), Wechsler Individual Achievement Test, the Adaptive Behavior Scale ("ABS"),

and the Developmental Test of Visual-Motor Integration. (Tr. 182–188, 252–54).  The WISC-III

yielded a full-scale IQ score of 56, a verbal IQ score of 66, and a performance IQ score of 59,

and these scores fell within the mild mentally handicapped range.  (Tr. 184, 253).  Additionally,

---

[2]     The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 401.1501 *et. seq.*, while the SSI regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because the definition of disability and the applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

the WISC-III revealed that Kelley's short term auditory memory was in the low average range, attention to visual detail and speed at remembering and reproducing symbols were in the borderline range, and all other subtests were within the mental retardation range. (Tr. 253). The ABS indicated that, while Kelley's personal self-sufficiency and social/personal adjustments were well developed, Kelley exhibited deficits in community self-sufficiency and social/personal responsibility. (Tr. 253). Overall, the tests revealed that Kelley's intellectual ability fell within the mildly mentally handicapped range and that his academic skills were within the first to second grade range. (Tr. 255). Accordingly, school psychologist Gail Mayton noted that Kelley still needed the school's special education services. (Tr. 254). September 1994 notes from Kelley's teachers indicate that they observed Kelley having continued difficulty with staying on task and completing homework and he often needed instructions repeated, however he did get along with his peers. (Tr. 187).

On September 27, 1995, WISC-III test results indicated that Kelley had a verbal IQ score of 66, a performance IQ score of 59, and a full-scale IQ score of 56. (Tr. 255). The Wechsler Individual Achievement Test revealed that Kelley performed reading, writing, and math skills at the first and second grade levels. (Tr. 255).

An annual review conducted in November 1995 indicated that Kelley was enrolled in the seventh grade in the mildly mentally handicapped program and he was functioning "very low" in the program compared to his program peers, he was having difficulty with memory and abstract reasoning, and he was reading at a second grade level. (Tr. 171–79). The records also indicated that he was earning low grades in his classes. (Tr. 174).

For the 1996–1997 academic school year, administrators again placed Kelley in a special education program for most of the school day because of his mildly mentally disabled status. (Tr.

165–70, 180). The records additionally noted that Kelley's skills were well below functional

levels, he did not complete homework, and he was on Ritalin for ADHD.

On October 23, 1997, when Kelley was in the ninth grade, his level of functioning was

re-evaluated. (Tr. 247–51). Testing revealed that Kelley had a verbal IQ score of 56,

performance IQ score of 68, and full-scale IQ score of 58. (Tr. 248). The Adaptive Behavior

Evaluation Scale (School Version) ("ABES-R") indicated that his adaptive behavior quotient[3]

was just below average. (Tr. 250). School Psychologist Jennifer Koskey explained that Kelley

"continue[d] to function in the range of a student who is mentally handicapped." (Tr. 251). She

further asserted that, while Kelley increased his grade level in math, he continued to function at

second and third grade levels with respect to his reading and spelling skills. (Tr. 251). She also

noted that his adaptive behavior quotient was somewhat higher than expected, his self-care and

communication skills were well developed, and he was able to complete simple household tasks

and fix simple meals. (Tr. 251). However, she also recognized that Kelley experienced

difficulty getting started on assignments and finishing them accurately after instructions were

provided. (Tr. 251).

In March of 1999, Kelley's individualized education program report noted that he was

pursuing a special education curriculum which focused on vocation and life skills. (Tr. 257).

The report indicated that his reading skills were poor, he needed a lot of help with assignments

for any general education class, and he functioned at a moderate mentally handicapped level.

(Tr. 256, 259). In describing Kelley's strengths, the report noted that Kelley had good work

habits and communication skills, and he worked well with his hands. (Tr. 258). The school

ultimately implemented a series of educational modifications and accommodations to assist

---

[3] The adaptive behavior quotient represents the degree with which one meets the standards of personal independence and social responsibility expected for one's age. (Tr. 250).

Kelley with his ability to learn, which included among other things the need to give written directions to supplement verbal directions, reduce visual distractions, and provide individualized allotted time to complete assignments. (Tr. 266).

Kelley's participation in the school's work experiences program in 1999/2000 and 2000/2001 revealed that he received good reviews, although he required more attention and direction than other employees in many aspects. (Tr. 274–77). Specifically, a review from his employer revealed that Kelley required more attention than other employees with regard to remembering instructions, performing tasks that required some imagination or decision-making, and taking initiative on the job. (Tr. 276). He also had some difficulty with remaining on task.

On November 13, 2000, school personnel conducted an assessment of Kelley's functioning. (Tr. 244–46). At the time, Kelley had been attending classes in the morning and then working at McDonald's. (Tr. 245). Notes from the evaluation indicated that he appeared to be doing well at his job, but that he did "not show much effort with academics in the classroom setting." (Tr. 245). Kelley's ABES-R evaluation resulted in a below average score of 78, where an average behavioral quotient would be 90 to 109. (Tr. 245–46). School Psychologist Jennifer Koskey noted that Kelley, who was in the twelfth grade at the time, demonstrated first and second grade skills and lacked communication and social skills. (Tr. 244, 246). Further, she recognized that although Kelley seemed to be gaining more from his experience in the workplace, he was less interested in classroom academics. (Tr. 246).

On August 17, 2009, consultative psychologist Dr. Victor Rini evaluated Kelley. (Tr. 287–89). With regard to Kelley's history, Dr. Rini noted that Kelley was single and living in his father's home with his two-year-old daughter. (Tr. 287). At the time, Kelley reported to Dr. Rini that he was in good physical health and denied any problems with anxiety or depression, yet

he also complained that he had trouble sleeping for months. (Tr. 287). Dr. Rini observed that Kelley's mood and affect was "pleasant with underlying depression and anxiety." (Tr. 287). After conducting a WAIS-III examination, Dr. Rini found that Kelley had a verbal IQ score of 67, a performance IQ score of 72, and a full-scale IQ score of 66. (Tr. 283). Kelley's verbal and full-scale scores were described as extremely low, and his performance score was described as borderline. (Tr. 283). Dr. Rini asserted that Kelley was not bothered by anxiety or depression during testing and that accordingly, Kelley's test scores accurately measured his memory and intellectual abilities. (Tr. 287). Additionally, Kelley was assigned a Global Assessment of Functioning ("GAF")[4] score of 59. (Tr. 288).

During the evaluation, Kelley reported that he had obtained a driver's license by having the test read to him and reported that he was able to provide for his own personal care, cook, clean, grocery shop, perform cash transactions, do laundry, and pick up after his child. (Tr. 288). However, Dr. Rini emphasized that Kelley's "report of his own capabilities may not be altogether reliable" and explained that Kelley not only had significant and overt deficits with functional academic skills and social skills, he also "overstated his actual ability to function in other areas of adaptive function . . . based on his test scores, which suggest[ed]—for example— that he is not able to provide for his own home as he maintains he can." (Tr. 288). Based on his findings, Dr. Rini diagnosed Kelley with mild mental retardation and adjustment disorder with depression and anxiety. (Tr. 288). In conclusion, Dr. Rini emphasized that Kelley functioned in

---

[4]      A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS-Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's level of functioning. While GAF scores have recently been replaced by the World Health Organization Disability Assessment Schedule, at the time relevant to Kelley's appeal, GAF scores were in use. *See* Wikipedia, Global Assessment of Functioning, http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning (last visited Feb. 3, 2014). A GAF score of 51–60 indicates moderate symptoms, such as flat affect and circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning.

the extremely low range of intellectual ability, his memory and concentration were in the low average range, and his social functioning was below average. (Tr. 288).

On September 3, 2010, state agency physician Dr. Donna Unversaw completed a mental residual functional capacity ("RFC")[5] assessment and a psychiatric review technique based on Kelley's medical records. (Tr. 290–307). She opined that Kelley was not significantly limited in his ability to understand, remember, and carry out short and simple instructions or in his ability to remember locations and work-like procedures, but that he was moderately limited in his ability to understand, remember, and carry out detailed instructions. (Tr. 290). Additionally, Dr. Unversaw determined that Kelley was not significantly limited in his ability to maintain attention and concentration, to perform activities within a schedule with regular attendance, to sustain an ordinary routine without special supervision, to work with or in proximity to others without being distracted by them, to make simple work-related decisions, to sustain concentration and persistence, and to interact socially with the public, co-workers, and supervisors. (Tr. 290–91). She further opined that Kelley demonstrated no significant limitations with adaptation. (Tr. 291).

After noting Kelley's 1994 WISC scores and 2009 WAIS scores, along with Dr. Rini's findings, Dr. Unversaw opined that Kelley was capable of performing simple work. (Tr. 292). Notably, Dr. Unversaw also believed Kelley suffered from mental retardation (having had a valid verbal, performance, or full scale IQ of 60–70), but found that Kelley only had mild limitations in performing activities of daily living and maintaining social functioning, with moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 294–304). Subsequently, on October 28, 2010, state agency physician Dr. Joelle Larsen reviewed the evidence and affirmed Dr. Unversaw's assessment. (Tr. 308).

---

[5]    Residual Functional Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545(a)(1).

*B.      Hearing Testimony*

On June 30, 2011, a hearing was held during which Jason Kelley, his mother, and the Vocational Expert ("VE") testified. (Tr. 32–77).

1.      Kelley's Testimony

Kelley confirmed that he spent several years in a special education program and was able to graduate high school.  (Tr. 39).  While in school, he sometimes drifted off and teachers had to remind him to pay attention.  (Tr. 57).  At the time of the hearing, Kelley had been employed for one week in a 90-day trial period with Vanguard.  (Tr. 36, 41).  He obtained the position after walking in and completing his own application.  (Tr. 41–42).  At Vanguard, he noted he assists with assembling semi-trailers, but has had difficulty learning the job, which includes operation of overhead cranes. (Tr. 40, 41).  Notably, Kelley had already been told about mistakes he was making.  (Tr. 48).

Regarding previous employment, Kelley testified that he never had a job that lasted more than six months.  (Tr. 42).  In 2010, he was employed by Anchor Truck Center washing semi-trucks; however, he confirmed that the job ended after a few months because the company "said [he] had an attitude towards other people."  (Tr. 43).  Thereafter, Kelley worked full-time as a dishwasher at Yesteryear's Meats, but he had to leave the job within two months because of family-related matters.  (Tr. 43).  Kelley also worked for three months as a dishwasher at Sand Creek Country Club ("Sand Creek").  (Tr. 44).  He testified that at Sand Creek, he occasionally fell behind and that another worker would assist him in getting caught up.  (Tr. 59–60).  Kelley further explained that he only fell behind three or four times and that it was attributable to the restaurant being very busy.  (Tr. 72).  He felt that he was capable of keeping a reasonable pace otherwise.  (Tr. 73).  Despite the occasional struggle to keep up, Kelley was not reprimanded or

fired from Sand Creek. (Tr. 59–60). Rather, his job at Sand Creek was terminated after he walked out because his employer would not permit him to go to the hospital when his eye was bothering him. (Tr. 44).

When asked what inhibited him from working, Kelley explained that he had trouble concentrating on the work, although he denied having any physical problems. (Tr. 47, 48). He asserted that the more tasks he is given, the more distracted he becomes. (Tr. 47). Kelley explained that he was able to work several hours without becoming distracted, but thereafter he sometimes began "spacing off" and then stopped paying attention to what he was doing. (Tr. 48). He believed he could lift 90 to 100 pounds at a time. (Tr. 46).

Kelley testified that he lives on his own but his bills and the rent are taken care of in exchange for his helping out around the house, and he takes care of his four-year-old daughter with help from his mother. (Tr. 38, 49, 52). He explained that his mother sometimes assists him with cooking, laundry, and watching his daughter. (Tr. 52, 53). While Kelley previously had difficulty doing laundry, once he was taught how to properly separate the clothing and operate the washer, he no longer experienced difficulty with laundry. (Tr. 54). He has his driver's license and can use his GPS to help him travel from one place to another. (Tr. 39, 288). Kelley asserted that, while he continues to struggle with reading some words, he is able to read children's books to his daughter. (Tr. 40). He believed that he could manage his own finances, but had difficulty with it at times and had trouble tracking the balance of his food stamps. (Tr. 49–50). Kelley also maintained that he was capable of taking care of his personal needs, such as showering, changing, and getting his clothes together. (Tr. 56). He also did not have any difficulty operating his cellular phone or using a gas pump. (Tr. 61).

Kelley testified that he enjoyed fishing, canoeing, and playing baseball and basketball. (Tr. 53). He explained that he has a temper, but treats others with respect if they do the same. (Tr. 55). Kelley denied taking medications or engaging in any type of counseling (Tr. 56), although he was previously taking Ritalin until doctors took him off of the medication for reasons that were unknown to Kelley. (Tr. 59).

2.      Margaret Sako's Testimony

Kelley's mother, Margaret Sako, testified that Kelley may have exaggerated some of his abilities. (Tr. 62). Specifically, she explained that she caught Kelley doing a full load of laundry on the low cycle, he missed a couple of his daughter's doctor appointments, and he struggled to keep track of his checking account balance. (Tr. 62). Although Ms. Sako asserted that she assisted in keeping an eye on and bathing her granddaughter, she also stated that Kelley "can pretty much help take care of [his daughter] and stuff." (Tr. 62). When questioned about Kelley's potential behavioral problems, Ms. Sako explained that Kelley gets angry over simple things. (Tr. 63). The ALJ asked whether Ms. Sako noticed any issues with depression or anxiety or whether Kelley just got upset easily, to which Ms. Sako answered that Kelley just got upset easily. (Tr. 63).

3.      Vocational Expert's Testimony

The VE characterized Kelley's past work as a dishwasher as unskilled work with a medium exertional level and an SVP of 2[6], although one of the dishwashing jobs actually performed by Kelley was performed at a heavy exertional level. (Tr. 65). The ALJ asked the VE whether an individual of Kelley's age, education, and work experience would be able to perform Kelley's past relevant work if the individual was limited to understanding,

---

[6]      SVP stands for "specific vocational preparation," or the Dictionary of Occupational Titles way of measuring the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the abilities needed for average performance in a specific work situation.

remembering, and carrying out simple, routine, repetitive tasks; but could keep pace to complete tasks and meet quotas typically found in unskilled work; could read only short, simple words; and could perform tasks that did not require him to make change or handle money. (Tr. 65). The VE responded affirmatively, stating that Kelley's previous dishwasher position could accommodate the aforementioned limitations and restrictions. (Tr. 66). Additionally, the VE asserted that other jobs existed in the national economy, which would accommodate the same restrictions. (Tr. 66). These jobs were at the medium exertional level with an SVP of 2 and included, but were not limited to, positions as a hand packer (21,000 jobs in the state, 798,000 jobs nationally), dining room attendant (7,510 jobs in the state, 401,000 jobs nationally), industrial cleaner (49,000 jobs in the state, 336,000 jobs), and automobile cleaner (7,000 jobs in the state). (Tr. 66).

Next, the ALJ asked the VE about work that could be performed by a second hypothetical individual who had all of the previously-mentioned limitations in addition to the following restrictions: ability to engage only in goal-oriented work instead of production rate pace type of work; ability to only tolerate occasional changes in the work setting; and ability to make only occasional simple decision-making. (Tr. 68). The VE responded that a restriction concerning occasional work changes would not have any effect on the individual's ability to perform the previously identified jobs. (Tr. 69). However, limiting a person to only occasional simple decision making would preclude all full-time, competitive employment. (Tr. 68–69). In addition, the VE testified that an individual who was unable to understand, remember, and carry out simple, routine tasks over an eight-hour day would be precluded from employment. (Tr. 69).

When asked about Kelley's occasional tendency to fall behind as a dishwasher and require extra help, the VE explained that the extra help that was required on only a few occasions

and was not an accommodation, but rather constituted "ordinary employment practices" when a restaurant becomes very busy. (Tr. 71). The VE also advised that an individual must remain relatively consistently on task for eight hours to maintain employment. (Tr. 75–76).

C.    *The ALJ's Decision*

On July 12, 2011, the ALJ rendered his decision. (Tr. 28). He found that Kelley had not engaged in substantial gainful activity since the alleged onset date of August 1, 2010, and that Kelley had a severe impairment of mild mental retardation. (Tr. 18). In relevant part, the ALJ also found that Kelley suffered from adjustment disorder with depression and anxiety, but determined that the impairment was non-severe because there was a lack of objective evidence that Kelley had ongoing problems or that he sought treatment due to the condition; Kelley denied any problem with anxiety or depression; and Kelley did not allege an adjustment disorder, depressive disorder, or anxiety disorder as disabling impairments in his application for benefits. (Tr. 19). The ALJ also determined that Kelley's alleged ADHD was a non-medically-determinable impairment. (Tr. 19). He reasoned that, although records indicated that Kelley reported an ADHD diagnosis and took a form of Ritalin in the seventh grade, "the claimant reported that he does not have a recent psychological or medical diagnosis related to ADHD and there is no objective evidence in the record to support that claimant was ever formally diagnosed with ADHD." (Tr. 19).

The ALJ next determined that Kelley's impairments did not meet or equal any listed impairment, either individually or in combination. (Tr. 19). *See* 20 C.F.R. pt. 404, Subpt. P, Appendix 1 ("the Listings"). He reasoned that, although evidence demonstrated an onset of mental retardation prior to age twenty-two, the Listing requirements of 12.05 had not been met. (Tr. 20). Specifically, the ALJ explained that the paragraph A requirements for Listing 12.05

were not satisfied because Kelley and his mother both testified that he was not dependent on others for his personal needs. (Tr. 20). Second, the ALJ found that the paragraph B requirements were not met because, although Kelley's 1995 and 1997 IQ scores fell within the requisite range, Kelley's 2009 IQ scores were not within the requisite range and more accurately reflected his true IQ. (Tr. 20). The ALJ reasoned that the record demonstrated that Kelley's "functional ability is much greater than his academic records would indicate" and Dr. Rini opined that the 2009 scores accurately reflected Kelley's abilities. (Tr. 20). Third, the ALJ found that the paragraph C requirements were not met because, although Kelley satisfied the IQ requirement, he did not have the requisite physical or mental impairment imposing an additional and significant work-related limitation of function. (Tr. 21). Last, the ALJ determined that Kelley did not satisfy the paragraph D requirements because Kelley only possessed mild restrictions in activities of daily living, exhibited mild difficulties in social functioning, displayed moderate difficulties with regard to concentration, persistence, or pace, and experienced no episodes of decompensation. (Tr. 21-22).

The ALJ ultimately found that Kelley had the following RFC:

> [t]o perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand, remember, and carry out simple, routine, and repetitive tasks; further, the claimant would be able to keep pace to complete tasks and meet quotas typically found in unskilled work; finally, the claimant would be able to read only short simple words and could not perform tasks requiring handling money.

(Tr. 23). With respect to his RFC finding, the ALJ afforded significant weight to the opinion of state agency psychological consultant Dr. Unversaw. (Tr. 25). When assessing Kelley's credibility, the ALJ determined that Kelley's overall level of functioning, including his activities of daily living, social functioning, and concentration, persistence, and pace, suggested that he

was not as impaired as he alleged. (Tr. 24). The ALJ emphasized, among other things, Kelley's ability to take care of himself and his daughter with some help from his mother; Kelley's ability to socially function well enough to apply for and obtain multiple jobs, care for his daughter, and attend medical appointments; Kelley's ability to follow instructions and answer questions without difficulty during medical appointments; and Kelley's ability to obtain a license with no difficulties. (Tr. 24). The ALJ recognized that both Dr. Rini and Kelley's mother believed that Kelley may overestimate his own capabilities, and the ALJ confirmed that he took this into consideration when assessing Kelley's RFC (without explaining how, *see infra*). (Tr. 25).

Ultimately, the ALJ determined that, although Kelley's mild mental retardation impairment was severe, it did not preclude him from completing basic work-related activities. (Tr. 25). Based on Kelley's RFC and the VE's testimony, the ALJ found that Kelley was not disabled because he was capable of performing his past relevant work as a dishwasher and he could perform several other occupations, such as hand packer, dining room attendant, and industrial cleaner. (Tr. 26–27).

### III. STANDARD OF REVIEW

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, the district court will affirm the Commissioner's finding of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable

minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. ANALYSIS

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant

has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform his past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Kelley takes issue with several aspects of the ALJ's decision. First, Kelley argues that the ALJ erred in finding that his adjustment disorder was non-severe. Second, Kelley contends that the ALJ improperly determined that his impairments did not meet or equal Listing 12.05. Third, Kelley argues that the ALJ failed to account for some of his alleged limitations in the RFC and failed to properly weigh the hearing testimony. The Court addresses each argument in correspondence with the sequential order of the ALJ's evaluation.

*A.*     *Whether the ALJ erred in finding that Kelley's adjustment disorder was non-severe*

Kelley first challenges the ALJ's step two determination that Kelley's adjustment disorder was non-severe.  At step two, the ALJ must determine the severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c); 404.1521(a).  According to 20 C.F.R. § 404.1521(b), "basic work activities" means:

> the abilities and aptitudes necessary to do most jobs. Examples of these include--
> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

In determining that Kelley's adjustment disorder with depression and anxiety was a non-severe impairment, the ALJ reasoned that the impairment did not significantly limit Kelley's ability to perform work activities.  The ALJ indicated that despite Dr. Rini's diagnosing Kelley with adjustment disorder with underlying depression and anxiety, Dr. Rini had also indicated that Kelley was not bothered by any depression or anxiety during his testing.  The ALJ also supported his finding by stating that Kelley had specifically denied problems with anxiety or depression, and there was no objective evidence indicating that Kelley had ongoing problems or sought treatment for adjustment disorder. (Tr. 19).

There are some troubling aspects of the ALJ's step two determination.  First, while the ALJ relied on Dr. Rini's assessment to make his determination, he did not make mention of other

information contained in Dr. Rini's assessment which may have specifically supported a finding that Kelley's adjustment disorder was severe. For instance, at step two, the ALJ completely ignored Dr. Rini's impression that Kelley overstated his capabilities and that Kelley's report of his own abilities may not be reliable. Dr. Rini's opinion in this respect would potentially account for Kelley's self-proclaimed denial of any problems with anxiety or depression and Kelley's having not sought further treatment for his mental health condition. Yet, no such discussion of this evidence favoring Kelley was provided, despite the ALJ's reliance on other aspects of Dr. Rini's report, and this was error. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that the ALJ has an obligation to consider all relevant evidence and cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding).

Additionally, although the ALJ supported his step two finding by noting Kelley's lack of treatment for adjustment disorder, the ALJ failed to inquire as to Kelley's reasons for not seeking treatment for his mental health problems. Had the ALJ inquired into the reason for Kelley's failure to pursue regular medical treatment for his mental health issues, then the ALJ would have been in a position to evaluate whether Kelley's self-reported capabilities were in fact credible, despite Dr. Rini's opinion that they were not. *See e.g., Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.") (citations omitted); SSR 96–7p ("the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."); *see also Mendez v. Barnhart*, 439 F.3d 360,

361-62 (7th Cir. 2006) ("The fact that a psychiatric patient does not follow through on counseling or take antipsychotic drugs regularly is a common consequence of being psychotic *and is especially to be expected of a person with a very low IQ*.") (emphasis added). The Court recognizes that some evidence of record, such as Dr. Unversaw's report, might support the ALJ's overall conclusion that Kelley's adjustment disorder with depression and anxiety was non-severe. However, the ALJ did not mention Dr. Unversaw's report as a basis for supporting his conclusion at step two. Even so, on remand, the ALJ needs to explain his inconsistent reliance on Dr. Rini's opinion and determine the reason for Kelley's lack of mental health treatment.

The Court realizes of course that once the ALJ finds any severe impairment—as he did here, by finding that Kelley suffered from the severe impairment of mild mental retardation—the claimant has already met the necessary threshold at step two and the ALJ is required to proceed with the five-step analysis. 20 C.F.R. § 404.1520(a)(4)(ii) (requiring a "severe" impairment to move on to step three); *Castile v. Astrue*, 617 F.3d 923, 926–27 (7th Cir. 2010) ("[T]he step two determination of severity is merely a threshold requirement."). However, in this case, the severity of other impairments also affected the ALJ's equivalency determination (step three), and therefore a correct assessment at step two remains important. *See e.g., Farrell v. Astrue*, 692 F.3d 767, 772 (7th Cir. 2012). Consequently, the Court remands the case so the ALJ may support his step two analysis with sufficient discussion.

B.      *Whether the ALJ's finding that Kelley did not meet Listing 12.05 was supported by substantial evidence*

Kelley next challenges the ALJ's determination that he did not meet or equal any of the impairments listed in 20 C.F.R. pt. 404, Subpt. P, Appendix 1. Specifically, Kelley contends that he satisfied Listing 12.05(C) for mental retardation. The Commissioner disagrees.

At step three, the ALJ must determine whether the claimant has met any of the listed impairments enumerated in the Listing of Impairments found in 20 C.F.R. pt. 404, Subpt. P, Appendix 1.  The Listing of Impairments describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity.  20 C.F.R. § 404.1525.  Thus, when a claimant satisfies the criteria of a Listing, that person is deemed disabled and is automatically entitled to benefits, regardless of his age, education, or work experience.  *Id.*; 20 C.F.R. § 404.1526.  For each Listing, there are objective medical findings and other findings that must be met to satisfy the criteria of that Listing. *Id.*  Furthermore, the claimant bears the burden of proving that his impairments meet the requirements of a Listing.  *See Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir. 1999).

Listing 12.05 contains an introductory paragraph with the basic description of the impairment "mental retardation."  Listing 12.05 also contains four sets of criteria (A through D). If the claimant satisfies the description in the introductory paragraph *and* any one of the four sets of criteria (A through D), then the claimant meets the Listing, and the claimant will be deemed disabled. *See Adkins v. Astrue*, 226 Fed.Appx. 600, 604-05 (7th Cir. 2007) (unpublished opinion).  Listing 12.05 states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or

B.  A valid verbal, performance, or full scale IQ of 59 or less; or
C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
   1.  Marked restriction of activities of daily living; or
   2.  Marked difficulties in maintaining social functioning; or
   3. Marked difficulties in maintaining concentration, persistence, or pace; or
   4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05.

At step three, the ALJ determined in relevant part that, although Kelley had the requisite IQ score, he did not meet Listing 12.05(C) because he did not have any other physical or mental impairment that imposed additional significant work-related limitations in functioning. (Tr. 21). Listing 12.05 states that an additional impairment presents a significant work-related limitation of function if, "[it] is a 'severe' impairment, as defined in §§ 404.1520(c) and 416.920(c)."  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Although 20 C.F.R. § 404.1520(c) and § 416.920(c) define "severe impairment" for purposes of the step two analysis, they specifically state that a severe impairment is an impairment which significantly limits a claimant's physical or mental ability to do basic work activities.  Thus, from a plain reading of the relevant Code of Federal Regulations, as cited, it appears that the definition of a "severe impairment" for purposes of step two is the same as the definition of an "additional and work-related limitation of function" for Listing 12.05.  20 C.F.R. §§ 404.1520(c), 416.920(c).

In *Higgins v. Barnhart*, the Seventh Circuit afforded deference to the Social Security Administration's similar interpretation of the regulation, noting that the Administration, itself,

equated "additional and significant work-related limitation" with "severe." *Higgins v. Barnhart,* 42 Fed.Appx. 846, 849-850 (7th Cir. 2002) (unpublished opinion). *See also Peterson v. Astrue*, No. 09 C 50084, 2010 WL 5423751, at *6 (N.D. Ill. Dec. 22, 2010) ("Seventh Circuit case law clearly equates the meanings of 'additional and significant work-related limitation of function' requirement under § 12.05C and Step Two's 'severity standard'"); *Elster v. Barnhart*, No. 01 C 4085, 2003 WL 124432, at *5 (N.D. Ill. Jan. 13, 2003) ("the newly revised § 12.00 equates 'additional and significant' with 'severe.'").

Here, the ALJ failed to mention whether Kelley's adjustment disorder had any impact on Kelley's ability to satisfy Listing 12.05(C). This is likely because the ALJ had already determined that Kelley's adjustment disorder was a non-severe impairment—a decision that, for the reasons previously discussed, requires remand. Should it ultimately be determined that Kelley has another severe impairment at step two, such as adjustment disorder, then this would be a finding that would be synonymous with Kelley's having an "additional and significant work-related limitation of function" under 12.05(C). Thus, on remand, the Court directs the ALJ to adequately explain how Kelley's adjustment disorder (or any other limitation for that matter) impacts his ability to satisfy Listing 12.05(C).

For purposes of remand, the Court also notes that the ALJ erred by misstating the standard noted in Listing 12.05's introductory paragraph. In his analysis, the ALJ asserted that, although there is evidence of Kelley's suffering from deficits in adaptive functioning, there is little evidence that Kelley had a "'*significant*' adaptive deficit " related to his social or interpersonal skills. (Tr. 20-21) (emphasis added). However, Listing 12.05 only requires *deficits* in adaptive functioning—not *significant* deficits. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05 ("Intellectual disability refers to significantly subaverage general intellectual functioning *with*

*deficits in adaptive functioning* initially manifested during the developmental period . . .")

(emphasis added); *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) ("The key term in the

introductory paragraph . . . is 'deficits in adaptive functioning.' The term denotes inability to

cope with the challenges of ordinary everyday life.") (citing APA, *Diagnostic and Statistical

Manual of Mental Disorders, Text Revision (DSMIV-TR)* 42 (4th Ed. 2000)). Consequently, on

remand, the ALJ shall apply the correct standard in determining whether Kelley also satisfied

Listing 12.05's introductory paragraph requirements.

C.    *Whether the ALJ erred with respect to his credibility finding and resulting RFC
      determination*

Kelley asserts that in deciding his RFC, the ALJ failed to make an adequate credibility

finding with respect to the hearing testimony provided by him and his mother, and failed to

account for some of his alleged limitations in the RFC. The Court agrees.

The RFC is an assessment of the work-related activities a claimant is able to perform on a

regular and continued basis despite the limitations imposed by an impairment or combination of

impairments. *Carradine v. Barnhart*, 360 F.3d 751, 780 n. 27 (7th Cir. 2004). This finding must

be based upon all of the relevant evidence in the record, 20 C.F.R. § 404.1545(a), and this means

that the ALJ is to consider, among other things, "statements about what [the claimant] can still

do that have been provided by medical sources" and "descriptions and observations of [the

claimant's] limitations . . . provided by [the claimant], [the claimant's] family, neighbors,

friends, or other persons. *Id.* (citing 20 C.F.R. § 404.1545(e) and § 404.1529). Further, the ALJ

must consider all medically determinable impairments, even if not considered "severe," 20

C.F.R. § 404.1545(a)(2), and the RFC determination must be supported by substantial evidence.

*Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). The ALJ's decision regarding a claimant's

RFC is a legal decision, rather than a medical one. 20 C.F.R. §§ 404.1546(c), 404.1527(e).

Kelley is correct that in finding him not to be credible, the ALJ initially used the same boilerplate language which the Seventh Circuit has admonished ALJ's for using.[7] *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012). However, more problematic is the ALJ's failure to explain whether he found Kelley's complaints of difficulties with focusing, concentrating, and multi-tasking, to be incredible, or whether he believed that Kelley suffered from these limitations to the extent complained of and therefore somehow accounted for the restrictions in the RFC finding. (Tr. 24). Without such an explanation,[8] the Court is unable to determine if the RFC finding adequately accounts for Kelley's lifelong documented difficulties of maintaining concentration and focus for a prolonged period of time. This is especially true where, in deciding the RFC, the ALJ afforded "significant weight" to the opinion of psychological consultant Dr. Unversaw, who believed that Kelley was capable of performing simple work because, in relevant part, he was not significantly limited in his ability to maintain attention, concentration, and persistence, sustain an ordinary routine, and work without distraction.

The ALJ also erred by failing to sufficiently explain how Kelley's ability to engage in activities of daily living, care for his daughter with assistance, and independently obtain employment and attend medical appointments, means that Kelley is also able to perform a full day of work on a regular and consistent basis given his mental limitations. *See Bjornson,* 671 F.3d at 647 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get

---

[7]  Specifically the ALJ stated: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 23).

[8]  And the ALJ's vague statement that the "RFC has taken into account the alleged impairments that are encompassed by [being] mildly mentally retarded" is insufficient. (Tr. 24).

help from other persons (in this case, Bjornson's husband and other family members), and is not held to a minimum standard of performance, as she would be by an employer.").  In fact, Kelley has never been able to maintain a job for longer than six months.  And while the ALJ supported his RFC finding by relying on Kelley's self-proclaimed abilities, the ALJ did so despite the opinions of Dr. Rini and Kelley's mother who believed that Kelley overstated his capabilities.  The ALJ noted in conclusory fashion that he had taken into consideration the possibility that Kelley might have overestimated his own capabilities (as opined by Dr. Rini and Kelley's mother), but the ALJ never explained what he meant by this.  In other words, the ALJ failed to explain in what respect he agreed that Kelley may have overstated his abilities and how Kelley's *actual* abilities were accounted for in the RFC finding.

On remand, rather than making the blanket assertion that "[t]o the extent the claimant's allegations are inconsistent with this [RFC] assessment, such [statements] are not deemed fully credible," the ALJ is instructed to explain which statements of Kelley's were discredited, especially in regards to his ability to maintain concentration, persistence, and pace.  In addition, the ALJ shall explain how Kelley's actual abilities and limitations were accounted for in the RFC assessment.

D.      *Steps 4 and 5*

The ALJ found that given the RFC determination, Kelley could perform his past work (step four) and other jobs that existed in significant numbers in the national economy (step five).  However, without a proper credibility determination and RFC evaluation, steps four and five cannot be properly analyzed. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the ALJ must determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p.  In

other words, the Court has no way of concluding whether the hypothetical questions posed to the VE ultimately included all of Kelley's limitations because there was an insufficient discussion of the record evidence supporting the ALJ's RFC determination.  Moreover, to the extent some of the more restrictive hypotheticals may have included all of the limitations from which Kelley suffers, i.e. the inability to understand, remember, and carry out simple routine tasks over an eight-hour day, the VE responded that Kelley would not have been able to sustain competitive employment.  In essence, given the unsupported RFC determination, it is impossible for the Court to determine whether the questions posed to the VE were adequate and inclusive of all the conditions Kelley alleges he suffers from, and whether the VE's testimony sufficiently established whether Kelley could in fact perform his past work and other work.[9]  *See Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011) (noting that ALJ's must provide vocational experts with a "complete picture of a claimant's residual functional capacity.").

## V.  CONCLUSION

For the aforementioned reasons, the Commissioner's decision is REVERSED and REMANDED for further proceedings consistent with the conclusions in this order.

SO ORDERED.

ENTERED:   February 10, 2014

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

---

[9]      Admittedly, the Seventh Circuit has occasionally assumed a VE's familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)).  This exception does not apply here, since the ALJ asked a series of increasingly restrictive hypotheticals that focused the VE's attention on the limitations of the hypothetical person, rather than on the record itself or the limitations of the claimant himself. *Id*. (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).